CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

SEP 27 2011

JULIA C. DUDLEY, CLERK
BY:
  DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) Criminal Action No. 5:11cr00007 |
| v. | ) |
| BRIAN WILLIAM MILLER, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Before the court is defendant's **First Motion to Suppress and Supporting Memorandum (Dkt. #s 22 and 34)**, filed on July 22, 2011, and August 30, 2011, respectively; the government's **Memoranda in Opposition (Dkt. #s 36 and 37)**, filed on September 1, 2011, and September 8, 2011, respectively; and defendant's **Reply Memorandum in Support (Dkt. # 38)**, filed on September 8, 2011. The court held an evidentiary hearing on defendant's motion on August 10, 2011, and a transcript of those proceedings was filed into the record on August 18, 2011 (Dkt. # 31). In his motion to suppress, defendant seeks to suppress statements he made to law enforcement officials on February 23, 2010, during the execution of a search warrant at his residence.

I

Based on the testimonial evidence presented at the evidentiary hearing on August 18, 2011, eight law enforcement officials (four Immigration and Customs Enforcement (ICE) Agents, one Rockingham County Investigator, and three Rockingham County Sheriff's Deputies), led by ICE Agent David Liu, executed a search warrant at defendant's residence just after 6:00 a.m. on February 23, 2010, in order to search for evidence of transmission and

possession of child pornography. Defendant lived with his parents, Mr. and Mrs. Miller, and his older brother, Alec Miller. The uniformed law enforcement officials knocked on the door of the residence, announced themselves as law enforcement officials, and gained entry into the home at the invitation of Mr. Miller when he answered the door. The officials openly carried and brandished firearms during this initial entry into the home, although there is a discrepancy among the witnesses concerning whether these weapons consisted only of handguns or other larger rifles. Agent Liu testified that this forceful entry into the home was done in order to secure the premises and ensure the safety of the officials and residents. The Miller family testified that they own between thirty and sixty guns, and defendant lawfully maintains a concealed weapons permit—officials found a firearm under his bed during their search.

Upon answering the door and granting access to his home, Mr. Miller testified that he quickly stepped out of the way and against the nearby washing machine as the officials entered the house. According to Mr. Miller's version of events, one official briefly, but forcefully, restrained and handcuffed him before escorting him to the living room, at which point the handcuffs were removed. Mrs. Miller was told to get dressed and was also escorted to the living room and seated separately from her husband. Meanwhile, Agent Liu entered the shared bedroom of Alec Miller and defendant with his firearm drawn and pointed at the brothers, awoke the brothers, ordered them to briefly put their hands above their heads, and escorted them to the living room as well. The Miller family testified that defendant was handcuffed in the bedroom before being brought to the living room, and the handcuffs were not removed until fifteen or twenty minutes later. In contrast, Agent Liu and Agent Rosalie Quintanilla, another ICE Agent on the scene, both testified that defendant was never handcuffed. If defendant was in fact handcuffed by officials upon their initial entry into the residence, those handcuffs were removed

2

fifteen to twenty minutes later and before defendant's private interview later in the morning with Agents Liu and Quintanilla.

Once in the living room, the officials' firearms were holstered, and the Miller family was told that the eight officials present were executing a search warrant and that no one was under arrest. It is unclear whether defendant had been brought to the living room at the time this announcement was made, but Agent Liu testified that he told defendant that he was not under arrest during their private interview later in the morning. Mrs. Miller testified that Agent Quintanilla also told the family, "[S]omeone here knows something and we're not leaving until we found out who." Agent Quintanilla denied making this statement. At some point the officials announced that anyone in the family was free to leave the house if they needed to go to work. Mrs. Miller testified that defendant was also not present in the living room for this announcement. Mr. Miller decided to call in late to work and remain in the home until he left later in the morning, but Alec Miller decided to go to work and was escorted around the house as he gathered his belongings and prepared to leave.

Before Alec Miller left the residence for work, he agreed to a short, private interview with Agents Liu and Quintanilla in Mr. and Mrs. Miller's bedroom, which was located down a long hallway from the living room. Alec Miller testified that at this time the atmosphere in the home was relaxed; however, he also testified that he reached for a tissue on his parents' bedside table during the interview, and in response Agent Liu reached for his holstered firearm and warned Alec Miller to take it easy. Defendant testified that the same thing happened during his subsequent interview with Agents Liu and Quintanilla, but Agent Liu denied reaching for his holstered firearm during either interview.

3

During Alec Miller's interview, defendant was briefly questioned in the kitchen of the home, at which time he was not handcuffed and after which Agent Liu asked if he would be willing to speak in private in Mr. and Mrs. Miller's bedroom. When defendant agreed, Agent Liu followed him down the hall to the bedroom and closed the door. Agents Liu and Quintanilla testified that they conducted their interview of defendant in private so that they could ask him sensitive questions, including about his internet activity—information that was not known by the rest of his family. Agents Liu and Quintanilla's interview with defendant lasted approximately two to two and half hours, during which time defendant was allowed to use the bathroom and take water breaks upon request. He was escorted during these breaks, however, in order to ensure his safety and the safety of others in the home, as stated by Agent Liu during his testimony. After defendant's escorted water break from his parents' bedroom to the kitchen, Agent Liu testified that he asked defendant if he would like to continue the interview. In response, defendant proceeded to walk back down the hallway to the bedroom, and Agent Liu followed behind him. Agent Liu testified that twice during the interview he informed defendant that he was not under arrest and that the interview was meant to be a "consensual and voluntary encounter," but Agent Liu did not tell defendant specifically that he was free to leave. Agent Liu also clarified that this disclosure was made before defendant began making incriminating statements. Agents Liu and Quintanilla never read defendant his Miranda rights.

Throughout the interview, defendant was seated on the edge of his parents' bed, and Agents Liu and Quintanilla were seated in chairs facing defendant and positioned between defendant and the door of the bedroom. Defendant described being blocked by Agents Liu and Quintanilla from exiting the bedroom, feeling intimidated and reluctant to answer questions, and feeling like he did not have the option to refuse to answer questions. Defendant did state,

4

however, that Agents Liu and Quintanilla did not abuse or threaten him in any way. In contrast to defendant's perception of the interview, Agents Liu and Quintanilla both testified that defendant provided detailed, lengthy answers to their interview questions, which is the reason why the interview lasted for such a long time. Moreover, defendant never said that he did not want to answer questions, that he wanted to stop the interview, or that he wanted to leave. Defendant testified that at some point during the interview he asked Agents Liu and Quintanilla if he needed a lawyer,[1] and he stated that Agent Liu threw up his hands in disbelief and told defendant that he did not need a lawyer. In stark contrast, Agent Liu testified that his response to the question was to tell defendant that he could not advise him on whether or not he needed a lawyer. At the conclusion of defendant's interview, defendant and Agents Liu and Quintanilla exited Mr. and Mrs. Miller's bedroom and returned to the living room. When the officials finished executing the search warrant they left the residence. No arrests were made, and no members of the Miller family were taken into custody.

In the instant motion, defendant seeks to suppress the incriminating statements he made during his private interview with Agents Liu and Quintanilla, arguing that the interview was a custodial interrogation conducted in violation of the Fifth Amendment of the United States Constitution because Agents Liu and Quintanilla did not read defendant his Miranda rights as required by law. The Government opposes the motion and argues that defendant's statements are admissible because defendant was not in custody at the time of the interview, so <u>Miranda</u> does not apply. The issue in this case is whether defendant was "in custody" for purposes of the

---

[1] The court finds that this statement by defendant was insufficient to invoke his Sixth Amendment right to counsel under the United States Constitution. In <u>Mueller v. Angelone</u>, the Fourth Circuit Court of Appeals held that similar language—"Do you think I need an attorney here?"—did not clearly invoke the suspect's right to counsel in order to necessitate terminating a custodial interrogation. 181 F.3d 557, 573-74 (4th Cir. 1999).

Fifth Amendment during his private interview with Agents Liu and Quintanilla in Mr. and Mrs. Miller's bedroom on February 23, 2010.

## II

Under the Fifth Amendment, no person "shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. This privilege against self-incrimination means that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from [the] custodial interrogation of . . . [a] defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). The procedural safeguards developed by the United States Supreme Court are known as a defendant's Miranda rights. Accordingly, prior to any custodial questioning, a criminal suspect must be warned of the following:

> [T]hat he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. . . . After such warnings have been given, . . . the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

Id. at 479.

These procedural safeguards only apply to interrogations when a defendant is "in custody," which the Supreme Court defines as "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Thompson v. Keohane, 516 U.S. 99, 112 (1995) (quoting Cal. v. Beheler, 463 U.S. 1121, 1125 (1983)) (internal quotations omitted); see also Stansbury v. Cal., 511 U.S. 318, 322 (1994); Or. v. Mathiason, 429 U.S. 492, 495 (1977) ("[A] noncustodial . . . [interrogation] is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on

6

freedom of movement, the questioning took place in a 'coercive environment.'"). The determination of whether or not a person is "in custody" is made by considering the totality of the circumstances surrounding the interrogation and whether a reasonable person would have "felt he or she was not at liberty to terminate the interrogation and leave." Thompson, 516 U.S. at 112; see also Berkemer v. McCarty, 468 U.S. 420, 442 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."). In this case it is undisputed that Agents Liu and Quintanilla did not read defendant his Miranda rights before, during, or after his private interview with them, so the admissibility of defendant's incriminating statements during that interview depends on whether or not defendant was "in custody."

Two recent cases from the Fourth Circuit Court of Appeals are instructive for purposes of determining whether defendant was "in custody" at the time of his interview with Agents Liu and Quintanilla. Both cases involve interrogations of suspects during the execution of search warrants to search for evidence of child pornography, as in the instant matter, but the court came to a different conclusion in each case and only found one defendant to be "in custody."

In United States v. Colonna, twenty-four FBI officials executed a search warrant on Willoughby Colonna's home at 6:29 a.m. in order to search for evidence of child pornography. 511 F.3d 431, 433 (4th Cir. 2007). Upon entering the home, the officials gathered Colonna's family members in the living room and then "went upstairs and kicked open Colonna's bedroom door," ordered him to get dressed, and "slammed him into a door jam causing injuries to his spine." Id. The suspect was then brought to the living room to join the rest of his family, at which time an official "advised Colonna that he was not under arrest" and asked to speak with him in a FBI vehicle parked behind the house. Id. What ensued was a three-hour interview

7

conducted by two officials in a FBI vehicle. Id. at 433-34. During the interview, one of the officials "twice advised Colonna that lying to a federal agent was a felony . . . ." Id. at 433. Although Colonna took several smoke breaks during the interview, he was never left unattended. Id. at 434. Colonna also never asked to leave the interview, he did not receive Miranda warnings, and he was not arrested at the conclusion of the interview. Id.

Based on the totality of the circumstances, the Fourth Circuit held that Colonna was "in custody" during the interview in the FBI vehicle and found that "a reasonable man in Colonna's position would have felt that his freedom was curtailed to a degree associated with formal arrest." Id. at 436. The court stated that "coercive pressures existed because Colonna's interrogation occurred in a police dominated environment where the agents did everything to make Colonna, or any reasonable man believe that he was not free to leave." Id. (emphasis omitted). As evidence of this "police dominated environment," the court noted the large number of officials present in Colonna's home, the fact that Colonna was awoken at gunpoint, the fact that Colonna was under constant supervision, the choice to conduct the interview in a FBI vehicle, the fact that Colonna was "bracketed" in the vehicle by the two officials during the interview, and the fact that Colonna was not told "that he was free to leave or that he did not have to respond to questions." Id. Although Colonna was told that he was not under arrest, the court stated that this factor alone is not determinative of a suspect's custody status. Id.

In a similar Fourth Circuit case, the suspect at issue was not found to be "in custody" for Fifth Amendment purposes. In United States v. Hargrove, between ten and fifteen law enforcement officers executed a search warrant on John Hargrove's residence shortly after 6:00 a.m. in order to search for evidence of child pornography. 625 F.3d 170, 173 (4th Cir. 2010). The officers knocked to announce their presence, entered the home upon invitation with firearms

8

drawn, and began their standard protocol of clearing the residence of any weapons and identifying all of the people in the home. Id. at 174. An officer told Hargrove that "he was not under arrest and was free to leave the house at any time" and then asked if Hargrove would be willing to speak with him. Id. Hargrove consented, and a subsequent two-hour interview was conducted at the kitchen table. Id. Two officers conducted the interview, with one officer standing in the doorway of the kitchen; both officers' firearms were holstered. Id. at 174-75. During the interview, Hargrove was not handcuffed and politely answered the officers' questions in detail. Id. at 174. The officers testified that "at no time did Hargrove ask for the interview to end or protest about any of the questions." Id. Furthermore, Hargrove was allowed general freedom of movement during the interview, with some restrictions based on legitimate law enforcement concerns regarding safety and the preservation of evidence. Id. at 174-75 and 181.

Based on these facts, the Fourth Circuit held that Hargrove was not "in custody" during the kitchen interview. Id. at 182. The court found that the officers' "custodial level of control" did not "extend beyond the initial entry" into the home, and the court emphasized the fact that only two officers conducted the interview, Hargrove was not handcuffed during the interview, the officers' firearms were not drawn during the interview, and the officers did not threaten Hargrove at any time. Id. at 179. Distinguishing Colonna, the court noted that Hargrove's bedroom door was not kicked open at gunpoint like in Colonna, Hargrove was not injured as Colonna was, fewer officers executed the search warrant at Hargrove's residence than in Colonna, Hargrove's interview was conducted at his kitchen table rather than a FBI vehicle, Hargrove was not threatened by the officers conducting the interview, Hargrove's interview did not last as long as Colonna's interrogation, and unlike Hargrove, Colonna was not informed that he was free to leave. Id. at 178.

9

Of particular importance to the Fourth Circuit was the fact that Hargrove's interview was conducted in his kitchen and the fact that Hargrove was specifically informed that he had the right to leave. Regarding the location of Hargrove's interview, the court stated:

> [A]lthough the setting of the interview is not singularly dispositive, an interview in a suspect's residence tends to be more neutral than one that occurs at a law enforcement facility. A more relaxed environment usually indicates less formal police control over the location or the defendant, and thus suggests a setting that is not of the degree typically associated with a formal arrest.

Id. at 180. Furthermore, regarding the officers' specific instruction that Hargrove was free to leave, the court found that "[s]uch a statement, that the interviewee is free to leave, is not 'talismanic' or sufficient in and of itself to show a lack of custody. However, it is highly probative of whether, in the totality of the circumstances, a reasonable person would have reason to believe he was 'in custody.'" Id. In conclusion, the Fourth Circuit held that "the totality of the circumstances supports the finding that a reasonable man in Hargrove's position would have understood that he was not 'in custody' . . . ." Id. at 182.

### III

After reviewing the totality of the circumstances surrounding the interview of defendant in the instant matter and comparing them to the facts in Colonna and Hargrove, the Court finds that the facts of this case are more like those in Hargrove than in Colonna and that the holding in Hargrove—that the suspect was not "in custody" at the time of the interrogation—should be extended to defendant's interrogation in this matter. Like in Hargrove, the search warrant in this case was executed early in the morning, the law enforcement officials only exercised custodial control over the Miller family during their initial entry in order to secure the premises, the interview of defendant was conducted by two officials within the Miller residence, defendant was allowed to move about the home with necessary safety restrictions due to the number of

10

guns owned by the Miller family, and defendant's interview lasted approximately the same amount of time as the one in Hargrove.

Additionally, the fact that defendant was not handcuffed during his interview with Agents Liu and Quintanilla follows the facts of Hargrove. Since there is a discrepancy over whether or not defendant was handcuffed at all during the execution of the search warrant at his family's residence, the Court will consider the facts in the light most favorable to defendant. Even in that light, it is undisputed that defendant was handcuffed for a maximum of twenty minutes during his initial encounter with officials and was not handcuffed during his private interview later in the morning, which the Court finds to be the most relevant period of time for its "in custody" determination. Moreover, the fact that defendant was ordered to put his hands behind his head at gunpoint during his initial encounter with officials does not change the court's analysis because the court finds that—given defendant's possession of a concealed weapons permit and the fact that officials found a firearm under his bed—the officials' actions were a reasonable part of their initial entry into the home and do not rise to the level of placing defendant "in custody."

Finally, like in Hargrove, defendant was expressly told that he was not under arrest; however, the officers' further instruction in Hargrove that the suspect had a right to leave—a fact of particular importance to the Fourth Circuit—is not present in the instant matter. The Court does not find this discrepancy dispositive, though, because the Hargrove court noted that such an instruction is only one factor, albeit an influential one, to weigh when considering the totality of the circumstances surrounding an interrogation. Moreover, Agent Liu in this case testified that he twice told defendant that the interview was meant to be a "voluntary and consensual encounter." The Court finds that this statement, coupled with the fact that the officials in the instant matter allowed members of the Miller family to leave the residence for work, keeps the

11

facts of this case in line with those in Hargrove, especially when compared with key differences in the Colonna decision.

Although several facts surrounding defendant's interview are similar to the interrogation in Colonna—notably, the fact that the search warrants in both cases were executed at each suspect's residence during the early morning hours; each suspect's interview was conducted by two officials; the families of both suspects waited in the living room; each suspect's interview lasted a similar length of time; both suspects were told that they were not under arrest; neither suspect was handcuffed during their interview; and neither suspect was expressly told that they were free to leave—the facts in Colonna that were most important to the Fourth Circuit's holding that the suspect in that case was "in custody" are not present in the instant matter. The Colonna court emphasized four factors when making its finding that Colonna was "in custody" during his interrogation: (1) the large number of officers at the suspect's residence; (2) the rough nature in which the officers handled Colonna; (3) the fact that the relevant interrogation took place in a FBI vehicle instead of in Colonna's home; and (4) the fact that the suspect was threatened by the officers with additional charges for lying. In contrast, far fewer officials executed the search warrant at the Miller residence than at the residences of both Colonna and Hargrove; defendant was not handled roughly by the officers even though he may have been temporarily handcuffed for safety purposes; defendant's interview took place in the more relaxed environment of his home; and Agents Liu and Quintanilla did not threaten defendant during their questioning. Despite the similarities between the interviews in Colonna and the instant matter, these four differences with regard to police presence at the residence, physical safety of the suspect, location of the relevant interrogation, and the nature of police conduct during the interrogation

prevent the court from extending the holding in Colonna to the interview of defendant in this case.

The only key factor noted by the Colonna court that is similar to the interrogation in this case, and different from the interrogation in Hargrove, is the fact that neither Colonna nor defendant was expressly told that he had the right to leave; however, as noted above, Agent Liu did tell defendant that he wanted the interview to be a "voluntary and consensual encounter." This statement, along with the fact that members of the Miller family were allowed to leave for work, sways the totality of the circumstances back toward the Fourth Circuit's holding in Hargrove—that defendant was not "in custody" during his interview with Agents Liu and Quintanilla, which means that his statements during that interview are admissible.

Accordingly, **IT IS ORDERED** that defendant's **First Motion to Suppress (Dkt. # 22)** is **DENIED**. The Clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to defendant and all counsel of record.

Entered: September 27, 2011

Michael F. Urbanski
United States District Judge